May it please the Court, Deputy Attorney General appearing on behalf of Respondent, I'd like to reserve five minutes for rebuttal if I may. In light of the previous arguments, I'd like to apologize at the outset that I did not provide the Court with all of the testimony relevant in this case. I did try, when I took issues with findings of fact, to provide those particular portions of the record in the excerpts. However, if the Court would like to have all of the testimony, I'd be happy to provide it. Although a number of arguments erased in the briefs, I would like to focus my argument today on the lack of prejudice in this case. In order to affirm the District Court's grant of relief, this Court would need to accept a remarkable coincidence as a reasonable probability and then find that the State's Court's conclusion to the contrary was not only erroneous but also unreasonable. The remarkable coincidence is that four independent witnesses, who did not know each other, all decided to falsely implicate somebody in this victim's murder, and all four of them happened to choose the Petitioner in this case. In granting the relief in this case, the Magistrate Judge who recommended relief not only ignored important prosecution evidence, especially Petitioner's separate confessions to two individuals on separate occasions, but made numerous critical errors in her findings of fact, which are fully laid out in the briefs, and compounded that error by failing to apply the deferential standard applicable under the AEDPA and instead applied the clearly erroneous standard of review. I submit to the Court that there are numerous facts clearly established in the record that refute the notion that counsel's failure to ask two of the four main witnesses about the reward could have completely turned the case around in Petitioner's favor. One of those is that at the time of the murder, before any reward had been offered, Mendoza provided such a detailed description of Petitioner to the police that they were able to provide a composite sketch. That composite sketch was admitted at trial, and the prosecution emphasized the similarities between the sketch and Petitioner. In addition, Luis Lopez came forward after seeing the sketch of Petitioner on the news. These facts alone, which I believe are undisputed, severely reduced the value of any cross-examination of Mendoza about his knowledge of the reward. Also on the night of the murder, Mendoza described Petitioner's age, height, and weight that ultimately matched Petitioner's appearance at the time of the murder. Mendoza told the police that Petitioner was 18 years old, approximately 5'5", 130 pounds. In fact, the defense stipulated at trial that Petitioner was, in fact, 5'5", and 150 pounds at the time of the murder. In addition, both Mendoza and Terrones, who did not know each other, described virtually the same getaway car to the police, a black two-door Camaro or Beretta, and both of the witnesses at one point or another said that they thought the car was a Camaro. And Mendoza said he thought that both the Camaro and Beretta looked the same from behind, which is the viewpoint that they had. And both testified that the car had continuous lights extending across the rear spoiler. I submit to the court that these descriptions could not have been, it would be remote that these two witnesses would have provided this virtually identical description of the car had they set out to intentionally fabricate the Petitioner's identification. In addition, Terrones testified at the time of the trial that even though Petitioner had no visible acne, he had acne at the time of the murder. And later, the prosecution introduced a photograph which showed that Petitioner suffered from acne just two weeks after the murder in this case. In addition, I believe that we do have to consider under Strickland Petitioner's confessions to both Lopez and Hinojosa, and I submit to the court that the magistrate judge erred by refusing to consider these very important confessions. Petitioner confessed his complicity to the murder to Luis Hinojosa, and on a separate occasion to Luis Lopez while they were incarcerated together. As detailed in the briefs... What did you say about when they were incarcerated together? At the time that Luis Lopez and Petitioner were incarcerated together in Juvenile Hall, Petitioner told Lopez that he had been involved in a murder at a store and that he acted the murder out as if somebody had shot the victim right in the center of the forehead. And I believe that that's a critical specific fact in this case. The magistrate judge indicated that all of the facts that Lopez knew were public. However, that's not truly accurate. In fact, there were no public facts, and even as of today, nobody has pointed to a piece of public information that showed that the victim had been shot in the center of the forehead specifically. There is an article that describes that the victim was shot in the head. However, I don't believe that explains how Lopez knew that she had precisely been shot right in the center of the forehead. And so his confession further demonstrates that the witnesses in this case had not only come forward in order to collect any reward. And Petitioner's confession to Hinojosa was materially consistent with his confession to Lopez. I would submit to the court that in light of all of this evidence before the jury, including the two important confessions and the fact that it's extremely remotely possible and remarkably coincidental that four people would choose to falsely implicate somebody, that all four of them would choose to implicate the same person, and that two people would just so happen to identify virtually the identical car, that that's simply too coincidental for this one question on cross-examination to have completely turned around the case. And I would ask the court to reverse the judgment of the district court. Thank you, Judge. Thank you, Your Honors. May it please the Court. Mark Grozdowski from the Office of the Federal Public Defender for Petitioner, Anna Pelley, Aaron Hinojosa. Addressing the prejudice prong, as the district court properly concluded, this was a weak case. The prosecution had a weak case. There was no physical evidence tying Mr. Hinojosa to the crime. May I interrupt you for one second? Because I have another question about whether the district court was on solid ground here. It seems that the district court may have adopted a magistrate's improper view of what the magistrate's standard of review was. Looking at this thing, the magistrate quoted an old case from the year 2000, Delgado v. Lewis, for the proposition that it must independently review the record to determine whether the state court clearly erred in its application of controlling federal authority. And Delgado, in turn, relied on our decision in Van Tran, which the Supreme Court overturned, saying that's not the right standard of review. So reading this whole thing, it looks like the magistrate and the district court, in turn, were using the wrong standard of review. Your answer to that is what? My answer is I think if we look at the order on the whole, that that's not the right conclusion to reach, and the court should actually be comfortable that the district court did apply the correct standard. But the district court said it was using a clear error, relying on Delgado and Van Tran. It was overruled by the Supreme Court. But in the preceding paragraph, the two paragraphs, it correctly cited the right standard under AEDPA. It cited both Williams v. Taylor and Lockyer v. Andrade, the two main cases on interpreting what unreasonable application means. And the court quoted the very language that the Attorney General now complains that it ignored. The court said, quote, the Supreme Court has admonished courts against you. What page are you talking about, so I can follow up? I'm talking about page 23 of the court's report and recommendation. ER what? 86. 86, okay. Continuing to quote, the paragraph right above Delgado quotes the language from Lockyer v. Andrade, and the court said. That's right, but they go on to say, to adopt Delgado, in this case, the California. This court, therefore, incites Delgado, and then says clearly erred, again citing Delgado. So it seems to me that this is all over the lot. I respectfully disagree, Your Honor. The court must independently review the record to determine whether the state court clearly erred in its application of controlling federal authority. Delgado and Van Tran. I think the court applied the right standard, and here's why. I'm asking this question about that. They seem to apply the right standard generally on EDPA law, and then they say, what do you do when there's no reasoned decision by the state court? And there is a different role there. The part about independent review of the record when there's no reasoned state decision is correct. The question is, I think, that it's true, you don't give the deference to a decision if there's no written decision. But, and you do make an independent review of the record. Whether it's to see whether the court clearly erred in its application of controlling law, I think may not be correct. I think you may do the independent review to determine the facts, but I'm not quite sure. But it's to some extent that they're correct, that where there's no reasoned decision, you don't give the same kind of review that you normally do to a reasoned decision. I agree with the court. I think what the district court was doing here was citing Delgado for that limited point that when there is no reasoned state court decision, as here, the federal habeas court independently reviews the record, but the law, which no one has disputed, is the right rule. But whether there was a constitutional violation that the state court wrongly denied and was objectively unreasonable is a separate question. And the district court quoted Andrade for that very point, just right above it, even though it cited that one blurb from Delgado about clear error, which is wrong, which is outdated law. I don't think there's any reason to think that the district court was applying the wrong standard here. I think the attorney general's argument in this regard, she's picking out one strand of a statement. I mean, it's kind of like what the Supreme Court said in the Bishotti case that federal habeas courts shouldn't do, that you should look at the entire opinion. And here, in the immediately two preceding paragraphs, the court is stating the correct law, and it's just citing Delgado for this independent review point. Well, what happens with the independent review is that in the absence of a reasoned decision by a state court on the issue, which is what we have here, the court does an independent review of the record to determine whether the state court's decision was objectively unreasonable. So that's what I'm looking for now, to see whether the conclusion of the magistrate judge was that the state court's analysis of the prejudice or the division performance was objectively unreasonable in light of a review of the record. That's correct. And the attorney general argued that the court doesn't discuss unreasonable application enough, and therefore wants us to conclude that it wasn't applying the right test. But it's very difficult in a situation like this, when there is no reasoned state court opinion, for the federal habeas court to critique it. You can't say where the state court went wrong, because here they just said petition denied. We know from Supreme Court cases, as the district court quoted here, that unreasonable application, objective unreasonableness, means something more than clear error. And what the court did here, what it could, which is it discussed the facts of the case, including the facts in the evidentiary hearing it held that the state court never held, and it discussed analogous cases finding Strickland violations. Well, the court ends its decision after it spends all the time analyzing what happened. It says, accordingly, the state court's conclusion to the contrary constituted an unreasonable application of clearly established federal law. So it would appear that in the end it did apply that standard. That's right. There's a case we cited in our brief for another point, White v. Roper. It's an 8th Circuit opinion on page 47 in our brief. And there the 8th Circuit rejected the state's argument that the district court Strickland analysis in that case was fatally flawed, because in one part of the opinion, the court defined the prejudice inquiry as whether there was a reasonable possibility of a different outcome. And the 8th Circuit noted that the district court's opinion had cited the correct standard elsewhere, and it quoted the Supreme Court's summary of that standard. And that's exactly what the district court did here. It quoted the right Supreme Court language. Thank you. What's your response on the exhaustion issue? Exhaustion is about giving the respondent and the state court notice of the substance of the claim. And that occurred here. And I think the best evidence of that is in the state's reply brief in support of its motion to vacate the evidentiary hearing order. After Day v. McDonough, it's about more than that. It's about jurisdiction, isn't it? My understanding is under ADPA, a court essentially cannot grant relief on a claim that is unexhausted, although under the Granbury, the Supreme Court's Granbury decision, which is a pre-ADPA case, which was also cited in Day, I believe under Granbury, when the state, as here, asserts exhaustion as a defense for the first time in the court of appeal, then the court of appeal has the discretion to decide whether to enforce that defense. And in the Granbury case, the Supreme Court emphasized that after there's been a full trial in the district court and all these federal resources have been invested, courts have the discretion to find that there was a waiver. And this exhaustion claim was not raised in the district court. In fact, the state argued just the opposite because when they moved to vacate the evidentiary hearing order, they never made the argument here. Instead, they said, Renoso, it appeared, was entitled to an evidentiary hearing on the question of whether the defense lawyer knew that Toronez and Mendoza knew about the reward and whether she had any strategic reasons for failing to cross-examine them. And I think that shows that that's what they understood the claim to be, and that's all exhaustion is about is giving them notice. And they knew what the claim is in the district court. They never raised it with the district court, and now they're taking the contrary position here. If I could just quickly discuss prejudice, there's a lot of talk about Hinojosa and Lopez and how important their testimony was, but Detective Escoda, the lead investigating officer, testified at the evidentiary hearing below that he requested that the reward be renewed because at that time he needed more witnesses. The case was not strong enough to file an information. Three years later, that's when it was renewed, three years later. It was renewed in October of 1998, and the only witnesses they had then were Hinojosa and Lopez, and the prosecution did not think that was enough to go forward. The reward was then renewed, and Mendoza and Toronez came forward. So I think that shows the value of Hinojosa and Lopez from the prosecution's own conduct. Also, the prejudice is clear in this case from the district attorney's closing argument, where she emphasized that Mendoza and Toronez did not have a bias in this case, that there was no reason for them to point the finger at Reynoso unless he was the actual perpetrator. And she vouched for them, saying they were so honest and so earnest and so pure. That goes directly to the prejudice in the defense lawyer not presenting this impeachment evidence. I'd like to add to what the Attorney General said. We will submit the reporter's transcript of the state trial, and I apologize we didn't submit that in the excerpts of record. Unless there are any further questions, I'll stop. Thank you. I'd like to address briefly the standard of review question. I think it's very clear from the report and recommendation that the magistrate judge was applying the wrong standard of review. What about the very final statement made that Judge Reinhart referred to citing the appropriate case? Yes, Your Honor. I do believe in the briefs I did argue that despite that, which I will point out, there's no discussion about why the state court's ultimate conclusion was unreasonable. The magistrate judge simply says, I've concluded that prong one is satisfied, I've concluded that there's prejudice, and therefore, because I made that conclusion, the state court's decision to the contrary was objectively unreasonable, and in doing so, completely fails to explain why her conclusion one way necessarily means that a conclusion to the contrary is not only wrong but objectively unreasonable. And I believe that by setting out in the beginning that in her mind and under the previous cases, objectively unreasonable equals clear error when there's a silent denial, I think that her invocation of the statutory language in and of itself, after she previously said, this to me means clear error applies when we have a silent state court denial, I don't think that her invocation of the statutory language at the very end satisfies a conclusion that she applied the right standard in this case after she previously defined that standard as meaning clear error when the state court's issued a silent denial. And after discussing both Williams and Andrade, she says, however, in this case, and she didn't use the term however, but in this case, the California Court of Appeal and the California Supreme Court issued silent denials of petitioners' current claims for relief. The court, therefore, gives less deference to these courts' decisions. Instead, the court must independently review the record, which I agree is the correct application of what the court needs to do, but she says to independently review the record to determine whether the state court clearly erred in its application of federal law. And I believe that that was a clear implication that the court is applying the wrong standard in this case. Well, you know, if you read our opinions, you'll find most of them start with a lengthy paragraph or page stating all kinds of standards of review, some of which have something to do with the case and some of which don't. And you never really know what they're doing. We might do better to just leave those sections out of our opinions, except when the standard of review is an issue. But it's hard to know from reading those introductory paragraphs what a court is doing. But when a court says at the end, here's the standard I applied, that carries a little more weight. The problem is what the judge did, gave all the reasons, and then said, to me, this is an unreasonable application. Now, I don't know of a single Supreme Court case that tells you how you know whether an erroneous application is unreasonable. I know they've said it's not enough that it be clear error. But I don't know of a single case that says, here's how you know what's an unreasonable application and what's just an error. All I can find in the Supreme Court cases is when they don't like the decision, they say, well, that's not an unreasonable application. And if they think the decision's one they agree with, they say, well, yes, that was an unreasonable application. I don't know what we expect the magistrate to do here, other than to give you the whole analysis of the problem and conclude that that is unreasonable. Well, Your Honor, I do think in this particular case, we don't have a report where she's simply boilerplate citing the applicable standard in the cases. She went out of her way to distinguish the applicable standard, set out an androdyne and said, I'm not going to apply that standard in this case because we have a summary denial. And I think that that goes to show that that's, in fact, the standard that she employed, the clear error standard. And I would go on. Then she would have ended her opinion by saying, therefore, it's clear error. Not necessarily because she previously said that in her estimation under the previous cases, clear error falls within the definition of objectively unreasonable. If you're right, what follows? Your Honor, I would ask the Court to independently review the record and on the basis of the evidence that we've outlined in the briefs and that I've mentioned here today, conclude that even if counsel had asked these two of the four main witnesses about the reward, that no prejudice ensued and that at a minimum Why wouldn't we just remand to the magistrate and ask her to apply the right standard? That's definitely a possible alternative, Your Honor. You know what would happen? She'd change the boilerplate at the beginning of the section and leave the rest the same. And then you'd be back here and we'd have the same argument. Well, I would hope that that we could point out some of the errors that we believe were made in the factual findings and that the magistrate judge would reconsider those in light of the appropriate standard. Summarize why you think there was no prejudice. Your Honor, there are at least six... Adriana, do me a favor. Do it without reading. At least six critical facts in this case that I believe weigh heavily against prejudice. Mendoza, before a reward was issued, cooperated with the police, gave them useful information. They prepared a composite sketch. At trial, it was introduced. It matched Petitioner's resemblance. The prosecutor argued that during closing argument. Look at the sketch and look at Petitioner. It actually matches. That really undermines any notion that he came forward and just picked somebody nilly-willy in order to collect money. And he's not the only witness. You have another witness who also says, yes, that's the guy who I saw at the store. And those are the only two witnesses who are potentially affected by the lack of the one question about the reward. But then you've got two more witnesses who came forward and said, the Petitioner is the one who was at the store with his friend and committed this robbery. And this woman died as a result of being shot in the center of the forehead. And if we only had one witness, maybe even just the two eyewitnesses, and this question had been asked, this might be a different case, but that's not the case here. You've got four people all living their own separate lives who come forward and identify the same guy. And the two eyewitnesses also describe almost the exact same car. And the chances of all that happening, had everybody decided to falsify an identification to either collect money or shift away suspicion, that's just not a reasonably probable theory. And it's not reasonably probable that the jury would have believed that. And the defense did a great job of thoroughly cross-examining the witnesses about all of the other credibility issues that was all already before the jury. So in light of all of that, I don't think that this one additional factor on cross-examination would have undermined the entire case and completely turned it around in Petitioner's favor. Can I give you a simple practice pointer? Yes, Your Honor. Your presentation is a thousand percent better when you look at us and talk. You know your case very well. When you look down and read, you lose communication. Thank you, Your Honor. I will keep that in mind. Thank you. Thank you both very much. The case is adjourned. It will be submitted. The final case for argument is Leisure Time v. Cal Vista. This is ridiculous.
judges: Reinhardt, Trott, Wardlaw